Sherry L. FLANSBURG, Appellant–
Petitioner Below,

v.

Earl W. FLANSBURG, Appellee–
Respondent Below.

No. 28A04–9012–CV–00588.[1]

Court of Appeals of Indiana,
Third District.

Nov. 12, 1991.

⚷1008.1(5)

Joseph A. Sullivan, Bloomfield, for appellant-petitioner below.

Don M. Robertson, James L. Whitlatch, Bunger, Robertson, Kelley & Steger, Bloomington, for appellee-respondent below.

STATON, Judge.

Sherry Flansburg appeals the trial court's judgment ordering the distribution of marital property in accordance with a "Post–Nuptial Agreement," presenting four issues for our review, rephrased as:

   I.  Whether the trial court erroneously applied the law of antenuptial contracts to the document labeled a "Post–Nuptial Agreement" by the parties.

   II.  Whether the agreement was supported by sufficient consideration.

   III.  Whether the agreement was procured by the fraudulent representations of Earl Flansburg.

   IV.  Whether the agreement should be invalidated as contrary to public policy for encouraging separation and divorce.

We affirm.

Sherry and Earl Flansburg were married in 1983. This was Earl's first marriage, and the fifth marriage for Sherry, who was represented by counsel in each of her four previous dissolutions. Sherry filed a petition for dissolution in September of 1986. In an attempt at reconciliation, the parties executed a post-nuptial agreement the fol-

lowing December.[2] After signing the agreement, the parties reconciled and Sher-

**2.** The agreement in its entirety reads:

### POST–NUPTIAL AGREEMENT

This agreement made and entered into by and between Earl W. Flansburg and Sherry L. Flansburg in consideration of the mutual promises herein contained, enter into the following post-nuptial marriage contract.

WHEREAS, the parties are currently married, having been married on the 12th day of August, 1983; and

WHEREAS, the parties are engaged in a dissolution of marriage proceeding in the Monroe Superior Court, Cause No. 53 D01 8609 DM0300; and

[Paragraph deleted and initialed by parties].

WHEREAS, Sherry L. Flansburg acknowledges that she owns no part of a condominium residence of Earl W. Flansburg; and

[Paragraph deleted and initialed by parties].

WHEREAS, Sherry L. Flansburg acknowledges that she has had certain long term medical, mental and psychological problems which are not the responsibility or obligation of Earl W. Flansburg, and Sherry L. Flansburg acknowledges that she is seeking a reconciliation with Earl W. Flansburg and willingly, openly and after full consultation and advice by counsel of her own choosing agrees that in the event of a future separation or divorce, that Earl W. Flansburg will have no obligation to provide support, maintenance, or medical care and will have no other obligation to her.

Sherry L. Flansburg acknowledges that she, by the execution of this agreement, is attempting to induce and allow Earl W. Flansburg to rely upon the representations herein made.

Sherry L. Flansburg hereby agrees to assume and pay all of her current obligations including the indebtedness at Irwin Union Bank in Columbus, Indiana and to hold harmless and indemnify Earl W. Flansburg from any indebtedness or obligation in connection with said indebtedness and acknowledges that she used Earl W. Flansburg's Master Charge Account at the Irwin Union Bank without his knowledge, permission or consent.

Earl W. Flansburg acknowledges that Sherry L. Flansburg, along with her minor daughter, shall be entitled to live in his condominium residence so long as the reconciliation of this marriage continues.

The parties agree that during the period of time they are living together each shall pay one-half of the costs of their maintenance.

In the event of separation or divorce, Sherry L. Flansburg covenants and agrees that she will, upon the oral or written request of Earl W. Flansburg, vacate Earl W. Flansburg's condominium and that she will make no demand for support, maintenance, medical care or any other financial obligation of Earl W. Flansburg.

Each of the parties hereby release and discharge the other party from all rights or claims that he has or may have against the other for the payment of interim or permanent support under the laws of any jurisdiction.

Each of the parties to this agreement acknowledge and understand that they have a statutory right of inheritance under the Indiana law of one-third ($\frac{1}{3}$) of the assets of the opposite party. Each party acknowledges that they may also have certain statutory rights of inheritance under the laws of any other state depending upon their place of residence, as it may change from time to time. Each of the parties is fully aware of the assets of the opposite party.

Each of the signatories hereto acknowledge that it is their desire, pursuant to Indiana law I.C. 29–1–2–13 or any other applicable statute or law of any other state, to waive their intestate share or other expectancy to which they may be entitled in the estate of the opposite spouse as a result of this marriage.

Each of the parties retain the right to dispose of or encumber or otherwise deal with their personal property owned by him or her as he or she deems fit free of any claim by the other as if he or she were unmarried.

All property recorded in the name of a party shall be the sole and separate property of that party according to the registered or recorded ownership.

If the parties separate or if their marriage is dissolved it is acknowledged that the furniture and contents of Earl W. Flansburg's residence shall be his sole and separate property except for those items of personal property belonging to Sherry L. Flansburg, which are identified on Exhibit "A" attached hereto and by this reference incorporated herein.

Each of the parties release and discharge all rights of claims that he or she has or may have for compensation; medical care or subsistence; or any interested property of the other party for work or money contributed in respect to the acquisition, maintenance, management, operation or improvement of the property.

No property owned now or in the future by either party is subject to division. In the event of the death of either party the right to property shall be determined by: (a) the ownership of the property, (b) the testamentary disposition of the deceased party, (c) the debts of the deceased party shall be paid entirely out of his or her own separate property.

This agreement is governed by and is to be construed and enforced in accordance with the laws of the State of Indiana.

Each of the parties will execute any and all documents to do all things reasonably required from time to time to give effect to the terms and intent of this agreement.

Each of the parties acknowledge that they shall be responsible for and pay their own personal indebtedness including any attorney fees or other charges incurred in the action for dissolution heretofore acknowledged as pending during the development and execution of this agreement.

ry dismissed the pending dissolution action. However, the marriage later foundered, and Sherry filed the instant petition for dissolution in July of 1989.

The trial judge entered findings and conclusions pursuant to Ind.Rules of Procedure, Trial Rule 52. The trial court found that Sherry, who had been represented and advised by her attorney and other counselors, entered into the contract voluntarily and with full knowledge of Earl's financial status. The court further concluded that the post-nuptial agreement was supported by adequate consideration, was not procured by fraud, and should be enforced. The court then ordered the marriage dissolved and the marital assets distributed in accordance with the post nuptial agreement.

■ Pursuant to Indiana law, married persons "may agree in writing to provisions for the maintenance of either of them, the disposition of any property owned by either or both of them and the custody and support of their children" in order to promote "the amicable settlements of disputes that have arisen or may arise ... upon the dissolution of their marriage[.]" IND.CODE 31–1–11.5–10 (1988). This statute has been interpreted as vesting the trial court with the discretion to accept, reject, or modify post nuptial or settlement agreements; valid antenuptial agreements, however, must be enforced as written. *In re Marriage of Boren* (1985), Ind., 475 N.E.2d 690, 695. The public policy of this state favors the amicable settlement by written agreement of the property rights of those citizens whose marriage is being dissolved. *Atkins v. Atkins* (1989), Ind.App., 534 N.E.2d 760, 762, *trans. denied.*

■ In support of her claim that the trial court abused its discretion in enforcing the post-nuptial contract, Sherry first maintains that the trial court erroneously declared the contract to be an antenuptial agreement and, accordingly, erred by applying the law pertaining to contracts made in anticipation of marriage. Earl responds that the court merely applied the law of antenuptial contracts by analogy. In its conclusions of law, the trial court stated:

6. The Supreme Court has set forth certain principles applicable by analogy to this case. These principles are that an antenuptial agreement has consistently been held to be enforceable so long as it is entered freely and without fraud, duress or misrepresentation and not, under the facts of the case, unconscionable. This is the state of the facts in this case.

Record, p. 11. We find that, under the circumstances, it was entirely appropriate for the trial court to apply the law of antenuptial contracts to the agreement executed in this case.

■ Here, somewhat of a hybrid agreement is presented. While the property settlement labeled a "Post Nuptial Agreement" was negotiated by the parties well into their marriage, it primarily concerned the distribution of property interests acquired prior to the marriage. *See Boren, supra,* at 695–96. Just as marriage is, in and of itself, valued and respected by the law as adequate consideration to support

---

Each of the signatories acknowledge that they have had independent legal advice and that they understand their respective rights and obligations under this agreement and that they are executing this agreement voluntarily in multiple copies, each of which shall have the same force and effect as the original.

This agreement is executed in consideration of the reciprocal promises and mutual covenants herein contained.

/s/ Sherry L. Flansburg
Sherry L. Flansburg
[Paragraph deleted].
Dated: 12–16–86
/s/ Earl W. Flansburg
Earl W. Flansburg

The undersigned acknowledges that he has read and examined this Post–Nuptial Agreement and has reviewed the same with his client, Earl W. Flansburg.

/s/ Don M. Robertson
Don M. Robertson
Dated: 16 Dec 1986
[Paragraph inserted and initialed by the parties]

The undersigned acknowledges that she has read and examined this Post–Nuptial Agreement and has recommended to her client, Sherry L. Flansburg, that she not execute the same.

/s/ Camie J. Swanson–Hull
December 16, 1986
Record, pp. 470–73.

an antenuptial agreement, *Matter of Estate of Palamara* (1987), Ind.App., 513 N.E.2d 1223, *reh. denied,* the extension of a marriage that would have otherwise been dissolved but for the execution of an agreement to reconcile has been deemed adequate consideration. *See Hanner v. Hanner* (1964), 95 Ariz. 191, 388 P.2d 239.

Other jurisdictions have recognized the validity of such contracts, called "reconciliation agreements," and have treated them in much the same way as antenuptial agreements. *See, e.g., Curry v. Curry* (1990), 260 Ga.App. 302, 303, 392 S.E.2d 879, 880 ("We know of no reason why a reconciliation agreement should stand on a different footing from an antenuptial agreement[.]"); *Yeich v. Yeich* (1990), 11 Va.App. 509, 399 S.E.2d 170; *Gilley v. Gilley* (1989), Tenn.App., 778 S.W.2d 862, 863 ("In our opinion, reconciliation agreements are in the nature of prenuptial or antenuptial agreements and should be generally governed by the same principles."); *Stadther v. Stadther* (1988), Ala.Civ.App., 526 So.2d 598; *Hanner, supra; Patino v. Patino* (1952), 303 N.Y. 999, 106 N.E.2d 276; *Mann v. Mann* (1946), 76 Cal.App.2d 32, 172 P.2d 369. We likewise see no reason to treat this reconciliation agreement any differently than an antenuptial agreement, despite the parties' designation of the document as a "post nuptial agreement." The trial court did not err applying the law of antenuptial contracts.

Sherry contends that the agreement must fail for lack of consideration. With respect to this issue, the trial court found:

### FINDINGS OF FACT

*    *    *    *    *    *

7. That the Flansburgs' marriage has been described by each of the parties generally as an unsuccessful marriage except for approximately three (3) months at the beginning of the marriage and three (3) months after the formal reconciliation.

8. That a first action for dissolution was filed by Mrs. Flansburg on September 16, 1986.

9. That during the pendency of that dissolution each of the spouses were represented by attorneys of their own choosing.

10. That during the pendency of that dissolution action a contract—labeled a Post Nuptial Agreement—was executed on December 16, 1986.

11. The dissolution action was then dismissed.

*    *    *    *    *    *

15. That Earl Flansburg furnished approximately Seven Hundred Fifty Dollars ($750.00) per month in support of the household as well as furnishing a house and/or condominium and paying utilities during the majority of the period of this marriage.

16. That during most of the period of this marriage a child, children or grandchildren of Sherry Flansburg lived in the Flansburg household.

*    *    *    *    *    *

25. That the parties executed a contract—labeled a Post Nuptial Agreement—while the first dissolution action was pending.

*    *    *    *    *    *

32. The Contract was relied upon by both parties.

33. That Earl Flansburg expended at least $64,000.00 in reliance upon this Contract.

*    *    *    *    *    *

40. There was valuable consideration given for the execution of this Contract as shown by the uncontradicted evidence of the expenditure of Earl Flansburg of approximately $64,983.14 to the benefit of Sherry Flansburg and her family as a result of reliance upon this agreement.

*    *    *    *    *    *

### CONCLUSIONS OF LAW

*    *    *    *    *    *

11. That Earl Flansburg, in reliance upon the execution of this contract, expended a significant amount of money

which provided ample consideration for the execution of this agreement.

Record, pp. 6–11.

When a trial court issues findings and conclusions under T.R. 52, we review the same under the following two-tiered standard of review: we first must determine whether the evidence supports the findings; then we determine whether the findings support the judgment. *Kaminszky v. Kukuch* (1990), Ind.App., 553 N.E.2d 868, 870, *trans. denied.* We will neither reweigh the evidence nor reassess the credibility of the witnesses and will not set aside the fact-finding of the trial court unless it is clearly erroneous. *Brancheau v. Weddle* (1990), Ind.App., 555 N.E.2d 1315, 1317. A judgment is clearly erroneous where a review of the record leaves us with a firm conviction that a mistake has been made. *Indiana Dept. of Correction v. Stagg* (1990), Ind.App., 556 N.E.2d 1338, 1341, *trans. denied.*

Both Earl and Sherry testified that they did in fact reconcile after they executed the agreement. Earl testified that he expended a considerable amount of money to support Sherry and her family after the reconciliation. By the terms of the agreement, each party waived rights that they would have otherwise been legally entitled to. *See supra,* note 1. Furthermore, as we have stated, the marriage itself, or in this case, the resumption of a marital relationship jeopardized by the initiation of dissolution proceedings, is adequate consideration for such an agreement. *See Hanner, supra.* The evidence supported the findings of the trial court, which findings supported the conclusion that there was adequate consideration for the agreement.

Sherry also contends that the agreement was procured by fraud. On the issue of fraud, the trial court made the following findings and conclusions:

### FINDINGS OF FACT

\* \* \* \* \* \*

14. That the evidence herein supports the conclusion that a full disclosure of Earl Flansburg's assets was made during the pendency of the first dissolution action and prior to the execution of the Post Nuptial Agreement.

\* \* \* \* \* \*

26. That prior to and at the time of the execution of this Contract each of the parties were represented by counsel.

27. That the Contract—labeled a Post Nuptial Agreement—was delivered to the wife's attorney.

28. That Sherry Flansburg and her attorney and other counselors had time to review this agreement and give it deliberate consideration.

29. That Sherry Flansburg and her attorney were provided with accurate and complete financial information as to Earl Flansburg's property.

30. That after several days' consideration Sherry Flansburg and Earl Flansburg met with their attorneys; they later met together in the office of one of the attorneys for the purpose of executing the Contract—labeled a Post Nuptial Agreement; the evidence disclosed that each of them drove separately; that after a meeting and further discussion the agreement was executed.

31. The Contract was executed after deliberation, without fraud, duress, undue influence or coercion.

\* \* \* \* \* \*

37. There were full and accurate disclosures by Earl Flansburg of all of his assets and property to Sherry Flansburg.

38. There was a knowing waiver by Sherry Flansburg of her rights prior to and during the execution of the Contract—labeled a Post Nuptial Agreement.

39. Sherry Flansburg executed the agreement after full deliberation, the advice of her attorney and other professionals and with a full and knowing understanding of all of the facts, terms and conditions of said Contract.

\* \* \* \* \* \*

43. That each of the parties to the Contract—labeled a Post Nuptial Agreement—were mature, experienced and at

all times relevant herein represented by counsel.

44. That there was adequate time allowed to each of the parties for deliberation and consultation with professionals.

45. In light of all of the facts the contract is not unconscionable.

46. In light of all of the facts the contract is fair, just and reasonable.

\*　\*　\*　\*　\*　\*

## CONCLUSIONS OF LAW

\*　\*　\*　\*　\*　\*

9. The facts herein establish that the contract herein was entered into without fraud, coercion or undue influence and there is nothing in the agreement unconscionable, unfair or unreasonable under all the facts and circumstances herein.

10. That the post nuptial contract was executed by Mrs. Flansburg after due consultation with her attorney and other counselors and with complete and accurate information as to the property of Earl Flansburg.

\*　\*　\*　\*　\*　\*

12. That the execution of this contract was a product of deliberation, calculation and without haste.

13. That the length of the marriage herein at the time of the execution of the post nuptial agreement was approximately three (3) years and Mrs. Flansburg was fully apprised of the extent and value of Earl Flansburg's property.

14. That Sherry Flansburg has failed to show any legal basis for voiding the contract—labeled a Post Nuptial Agreement herein.

Record, pp. 6–12.

■ It is true that antenuptial agreements are valid and binding "so long as they are entered into freely and without fraud, duress, or misrepresentation and are not, under the particular circumstances of the case, unconscionable[.]" *Boren, supra,* at 693. The same should be true for reconciliation agreements made between parties who have separated or filed for dissolution.

Sherry points to a recent Massachusetts case, *Fogg v. Fogg* (1991), 409 Mass. 531, 567 N.E.2d 921, where the trial court set aside an agreement alleged to have been executed in order to preserve the marriage. The court in *Fogg* concluded that, while the husband earnestly desired to preserve the marriage, the wife was solely concerned with arranging a satisfactory financial settlement. The agreement was determined invalid as being induced by the wife's implied fraudulent promise that she would attempt to preserve the marriage. *Id.* In the present case, however, the trial court found that no fraud was committed in obtaining Sherry's signature on the document. This finding is supported by Earl's testimony that he desired a reconciliation, and by the evidence that the parties did indeed reconcile and remain married for an additional three years. It is also worthy of note that the party filing for divorce in *Fogg* was the party who had secured the favorable financial settlement. Earl did not initiate the divorce proceedings in this case. Applying our standard of review which prohibits the weighing of evidence and assessment of witness credibility, the conclusion that there was no fraud in the procurement of the agreement is not clearly erroneous. *Brancheau, supra,* at 1317.

■ Sherry next argues that the reconciliation agreement is invalid as a matter of law because it encourages separation and divorce, citing *Matthews v. Matthews* (1968), 2 N.C.App. 143, 162 S.E.2d 697 and *Ransford v. Yens* (1965), 374 Mich. 110, 132 N.W.2d 150. These cases, both of which deal with separation agreements, do not support her position. In *Matthews,* the court held that an agreement not to separate was void as against public policy, because "the law looks with disfavor upon an agreement which will encourage or bring about the destruction of the home." 2 N.C.App. at 143, 162 S.E.2d at 699. The court noted, however, that such agreements are valid where the separation has already taken place or immediately follows. *Id.* In *Ransford,* the court upheld a separation agreement where the parties expressly agreed to continue to live as husband and wife. Because the agreement in

*Ransford* was not calculated to favor a separation or breakup of the marriage, the contract was enforced. In like fashion, the Flansburgs executed their agreement as a prerequisite to the resumption of the marital relationship. We do not agree that the Flansburgs' reconciliation agreement encouraged a separation. As our supreme court observed: "Such agreements can only promote or facilitate marital stability by settling the expectations and responsibilities of the parties." *Boren, supra,* at 694 (referring to antenuptial contracts).

■ We conclude that a reconciliation agreement may be enforced as long as it is entered into freely and without fraud or misrepresentation, or is not otherwise unconscionable. In fact, under the reasoning of *Boren,* it would be error for the trial court to reject a valid reconciliation agreement that provided for the distribution of marital property. As the court in *Boren* observed:

> The truth is, it is exceedingly difficult to imagine why, in any case where there is no fraud, courts should displace the judgment of contracting parties and substitute their own. No persons in the world can so well and so justly judge as the contracting parties themselves, and it is only in the strongest and clearest cases that courts should disregard their judgment, and never where there is neither positive wrong nor a fraud.

*Id.* (quoting *McNutt v. McNutt* (1888), 116 Ind. 545, 550, 19 N.E. 115, 117).

In this case, the evidence indicates that Sherry was married and divorced four times, and at each dissolution was represented by counsel. She admits reading the document twice, and signing it after being advised by her attorney that executing the document was not in her best interests. *See supra* note 1. Under the circumstances, the trial court did not err by adopting the agreement for purposes of distributing the marital estate.

Affirmed.

SHARPNACK, J., concurs.

GARRARD, J., dissents and files separate opinion.

GARRARD, Judge, dissenting.

I dissent. The agreement here in issue was not an antenuptial agreement, and the policy reasons supporting the validity of such agreements entered into in contemplation of an impending marriage are not present. *See In re Marriage of Boren* (1985) Ind., 475 N.E.2d 690.

Secondly, the agreement is not validated by I.C. 31-1-11.5-10 because clearly it was not entered into *"attendant upon* the dissolution of their marriage." *Boren,* 475 N.E.2d at 695.

Finally, whether or not Indiana should consider validating so-called reconciliation agreements I find both problematical and an issue not properly before the court at this time.

Assuming *arguendo* that the desires of a couple to reconcile and make their marriage work are within sound public policy and might constitute valid consideration for a contractual agreement, the contract at bar neither recites in preamble nor contains any covenants by the parties to that effect. Indeed, it does not mischaracterize the agreement to state that it merely permitted the wife to return to the house with her daughter if she paid half the living expenses and agreed to give up any claim to the husband's property in the event of a future dissolution. It strikes me that the impact of such an agreement impedes rather than promotes honest efforts at reconciliation. Additionally, it is contrary to the public policy declared by the legislature concerning the division of property to be had upon the dissolution of a marriage. *See* I.C. 31-1-11.5-11. I find no basis for counterbalancing that policy in the facts before us.

Accordingly, I would reverse and remand for a new trial.